Good morning. I'm Mark Page. I'm representing the appellant Rodney Belvado. Your Honors, I don't want to reiterate everything that's in the briefs. Obviously, I think it's been fairly well briefed, but there were a few highlights I wanted to point out. One of the first things, I think, to put things in context is in our excerpts of record on page 177, that in the course of – oh, and I did want to reserve two minutes for rebuttal. In the course of Dr. Parrish's evaluation and getting background with respect to Mr. Belvado, at the top of that page, she talks about standard achievement tests that were given. In the middle of the paragraph, it says the same test was given in 2000. The government has indicated that my client graduated from high school. He graduated in 2002, which is also in this report on the previous page on 176. And in 2000, it says his overall score was at the middle fourth-grade level. His total reading score was a late third-grade level. His mathematics score was at a beginning eighth-grade level, and his language score was at the middle of the fourth-grade level. That's the individual that we're talking about. And these types of facts from Dr. Parrish, when undisputed below his IQ range, verbal IQ 67 seems to be the most important one since the interview is verbal. We have cases, though, where the defendant had a low IQ. I'm thinking of Glover, where the defendant was in the bottom one percentile of Society for Intelligence and had a reading ability between the first and second grade level. But the court nevertheless said that the district court's determination that he had made a knowing and intelligent waiver wasn't clearly erroneous. So even if the district court made an error on how many years he was in high school or whether he was in special ed in high school, how does that make a difference for our determination about whether the district court was clearly erroneous? Because I think what happened here at the district court is, as I've referred to it in my brief, the difference between an overabundance of evidence regarding his functioning level and the fact that he's brain damaged and how that affected him and his abilities versus what the court seemed to rely on is the agent said, meh, he seems okay to me. The agent spent 30 minutes with him. That's it. Dr. Parrish, who was virtually dismissed by the district court, spent hours with him testing him. The government in a year, 11 months, between the time that the motion was filed by the defendant in the trial court, which was in May of 2005 to the time of the hearing in April 2006, didn't have him examined, didn't present any testimony from an expert critiquing Dr. Parrish's tests or test results or test analysis or the opinion that she drew from those. Not one bit. This is very much like the case the court cited to in its memorandum opinion of Garibay. You have significantly impaired language skills. Now, Garibay was slightly different because there he spoke Spanish. And it was there. You know, I was struck in Garibay where the court said at the end in a footnote, well, if he had just signed a written waiver, this would all have been different, where here, of course, he did sign a written waiver. He did. It was his native language. So it seemed fairly different from the situation that was so disturbing to the court in Garibay. Well, here he did sign a waiver, but I would suggest to the court, as we've addressed in the brief, that I think it was misled about the waiver. He's told, just sign this. This says you know your rights. And then Agent Belvedo, his uncle, who shouldn't even have been in the room, was there. He'll sign it after you. I'm not sure about the uncle part. It seemed to me it was a much more distant relationship with that, and they did not have a close personal relationship. Yeah. That's, that was, I think it was. I mean, if you're going to make that argument, you can make that argument. But to inject it flying by, I don't, it doesn't register with me. Well, I wasn't necessarily making that argument here because I think it was more relevant to the voluntariness issue, which was already decided by the court. But which is, in fact, what was pressed by the defense, and I realize you weren't the counsel at that time. But the motion to suppress was founded almost entirely on the voluntariness issue, which makes me wonder, is the capacity of this individual to understand so apparent? I mean, you fault the government for not having testing done, and yet having had the testing done, what the defense counsel at the time pressed was not an issue of whether he understood the rights, but whether the confession was voluntary. So is it really so glaring that the government should be expected to jump in with a response to something that wasn't being argued by the defense? Well, I believe, I believe that it was argued by the defense because there was questioning during that suppression hearing that was absolutely right on point that resulted in Dr. Parrish testifying. I think both in response to defense questioning, as well as I believe Judge Carroll, the district court judge, had inquired of her that it ended up in her saying that a person who doesn't understand the rights certainly can't understand the waiver of the rights and abandoning those rights. Her comment with regard to his ability to understand and the judge's response during the questioning toward the end of the day centered on her report of what Mr. Belvado said in response to her inquiries. Yes. Let me start before we get to that. Has there been any submission, testimony, declaration, anything on behalf of the defendant himself as to what, whether or not he understood or what he understood from the warnings that he was given? The defendant did not testify. He did not submit a declaration of any kind? There was nothing submitted, Your Honor. So all we have with regard to the particulars are the comments by Dr. Parrish both in her report and her testimony. Is that correct? Yes. And at that time, she wasn't talking specifically about what he understood. She was projecting back, but she didn't ask him, it appears, any particulars about what he understood at the time. She asked him in a contemporaneous fashion, explain to me what your rights are. Is that correct? Yes. In a little colloquy, I guess, at the beginning of their evaluation process. That's correct. She was talking to him about, you know, tell me what you know sort of a thing. What he said in response, according to her report, and I'm looking at ER 176, he volunteers the connection to Miranda rights. And then the quotation she has, he said, the right for yourself, something to help you have your rights, when asked about the right to remain silent, he said, quote, to be quiet when being questioned, when they're asking you questions, be calm, don't say anything. Why doesn't that reflect an understanding that he's not required to say anything? Because, Your Honor, and this is something I'm sure the Court is aware that I harped on in my brief and things, is because the rest of it goes on to say that because the analysis here is a two-part thing. Not so much, not, I don't mean not so much, but it's, not only did he understand the right itself, but did he understand the nature of giving it up. And the rest of what he says here, what she records that he says here, is that it says on 176, it says remain silent because if you keep talking, they might add more things on top, like charge you with harassment or using exclusive words like cussing. This is a young man who's sitting there being questioned about killing somebody in a brutal fashion, and he's concerned about being charged with cussing. That is a kid that doesn't get it. He doesn't get what these rights are intended to protect him from, not just the right to remain silent, but there's another one in there, the right to an attorney. He doesn't get what these rights really mean to him, and he certainly doesn't get what giving them up means, and Dr. Parrish addressed that also, that she was concerned that two things, one, culturally, that you try to be, culturally and with respect to also him in particular and his psychological testing, that you try to be cooperative, and second, that he was concerned that he might be accused of being obnoxious. That's not a guy who gets it and understands what's going on, what's happening to him, what the agents are trying to do to him. And you couple that with the interrogation itself, which the contents of it aren't necessarily the issue, but the way he was told what happened. He was told this. He was told, we know you did this, and he was given instructions, if you will, as to what it is that happened and how to confess with it. This is a kid that just doesn't get it. Okay. Let's hear from the other side, and we'll give you a little time to respond. May I please inquire, I'm Randall Howell, representing the Union of States in this matter. The question of whether the defendants, Miranda Rice, were violated has a two-part task, and the part that the government has always maintained that the district court and this court has never addressed is that the defendant was not in custody at the time of the interview. So whether Miranda Rice should have been given, or whether the waiver was going in intelligence, this court does not get to that question before it determines whether the defendant was in custody. Okay. I wasn't on the prior panel, but when I read the prior panel decision, it seems that if the panel had thought that that was a live argument, then it could have upheld the district court on the grounds of he wasn't in custody. But they sent it back and they said, check out this knowing and intelligent. It seems to me in just reading this record that the panel had decided implicitly  why isn't that the case? Why isn't that already the law of the case here? In order to find a Miranda violation, as I stated, there's a two-part analysis. If this panel believes that the prior panel has implicitly ruled on that, I'm happy to move on, but that's a very strange thing. Why don't you move on? Move to the second one. Surely. For purposes of your argument at this time, without asking you to waive your custody argument, let's go on to knowing necessarily. Sure. When the district court took in all of the circumstances, it did not clearly err in finding that the waiver was knowing and intelligent. Well, what about the language that, I guess, Mr. Page cites, where he says, well, what the right to be silent means is that you should keep silent so you don't get in trouble for saying bad words. I mean, that certainly suggests that he isn't totally on top of the meaning of the Miranda rights or what he's giving up. It shows that he only has a rudimentary and unsophisticated understanding, but he does understand the concept that he doesn't have to say anything that he should not say anything. I agree with you. He does say that in the language that preceded what Judge Akuta just read and we had before us, which is to say, he says, be calm, be quiet. But the consequence of not being quiet, I mean, that's the important thing. What happens if you speak up? Well, what happens if you speak up is that your confession may be used to convict you. He says, well, what happens when I speak up? I might get charges on top for using exclusive words like cussing. So the consequence, he totally misses in his description of what's at issue. Well, he does understand that making statements is not in his interest. Well, but there are various forms of interest. One of them is you go to jail for life. The other one is they get after you for using cussing words. Those are very different consequences. Well, when you examine the totality of the circumstances here, it's clear that he He goes at it for 30 seconds. He signed it. They read him his rights in his primary language. He had prior experience with law enforcement. Here's my problem, and it may not be merely a problem with this case. It may be a problem with are we, as judges in applying this test, expected to speak and understand English? That is, is this a knowing and intelligent waiver? If we're speaking English, my answer is absolutely not. That is, he's not particularly intelligent. That's undisputed. He doesn't really know. If we were to ask a person of normal intelligence, after having had this explained, would you explain what the Miranda rights are? And they say they come back to us. If it's a test, he gets an F. I mean, he just doesn't understand this. So that's how I understand knowing and intelligent if we're speaking English. The case law, however, doesn't seem to speak English. That is to say, we've got a lot of case law where we have people who, in that sense, are having trouble. So my problem is how far from the English language are we supposed to go in applying this test? Well, we have to look at this on a practical level. If you look at the statement that he wrote, which is included in the supplemental excerpt of record at page 28, he gave a reasonable, coherent narrative of the events. If the defendant were as intellectually challenged as he is portrayed here today, he would not be able to write that statement. He wrote that statement by himself with no assistance. The district court is in court with the defendant. Well, you say he wrote that with no assistance. In one sense, that's right. I take the officer's testimony as true, that he said, now, here, you just write this in your own words. I mean, that's what's on the tape. I have no indication, no suggestion at all. That there's anything off the tape. On the other hand, wrote this by himself isn't quite true because he's writing this after we've had the interview that has been very suggestive to him. He now knows what's being expected of him. I wouldn't take issue with the characterization that is suggestive. If you listen to the tape. I didn't listen to it, but I've read the transcript. Yes. The questioning is very soft, is very polite. It may be insistent, but the officers are trying to find out the truth. Well, I'll say this, and I want to make sure to the degree to which I agree with you. I mean, if this was a knowing and intelligent waiver, the sort of questioning that the officers engaged in here is entirely within bounds. I mean, I don't say that this was impermissible questioning. It was, however, suggestive, as most such questioning is. By disagreeing, if what you mean by suggestive, that the officers disagreed with the defendant's initial statement of facts, then I suppose all our questioning is suggestive. But we have a defendant who does not give any indication of not understanding his rights, not understanding the questions that are posed to him. His mother never tells either agent that the defendant has a history of some intellectual deficit. It's undeniable that the psychologist found that he did not understand his rights. But the district court was in court with the defendant, saw him interact with court personnel. He wasn't listening. I mean, the judge isn't supposed to overhear conversations between defendant and counsel, and defendant didn't testify. So what real basis is there to observe the content or to understand the content to know whether defendant is responding appropriately? He can observe how the defendant is interacting with people in the courtroom and there is no indication that he was so intellectually challenged that he did not interact appropriately with the court personnel. And of course, important is that that is consistent with the agent's testimony. There was no indication that he did not understand what was going on. And that, at bottom, despite his lack of legal sophistication, is what we mean by a knowing and intelligent waiver. Thank you very much. Okay. Thank you. You've saved 12 seconds. Why don't we give you a minute? We're not going to cut you off. You say what you need to say. Your Honor, one word the government attorney, Mr. Howell, just used here was totality. And totality doesn't mean pick out this and ignore what doesn't work. The totality of the evidence included Dr. Parrish, which was basically ignored. Let me ask you this, and this may be critical, is the standard review de novo? Is the standard review clear error? I mean, it doesn't seem to me as though we haven't disputed facts in the sense of he said, she said. There's a dispute as to how much he understood. And I looked at the 2254 cases where obviously there's quite a bit of deference. How clear is it that this is clear error review? Well, Your Honor, I guess I would lean towards the de novo review of the suppression decision. That doesn't surprise me, but help me out with some case law. You're not shocked. I think even with clear error review, I think this is a clear error situation, because totality doesn't allow you to just ignore a large and the most, I think, important piece of the evidence, because it results from actual testing and data that can be examined. The other thing, the Court asked the question, how far do we go, essentially, with the English language, and saying this is English versus English, so to speak. And I think that that rests in the standard, if you will, Judge. And the standard, with respect to waiving a fundamental right, is that it's a very heavy burden. It's a great burden. It's not easily met. It's met all the time. What's that? Very few confessions are thrown out based on an argument that the waiver was not knowing. So don't you really can't say it's very rarely met. Almost all confessions survive that test. Well, yeah, in that sense, but again, I don't know that we know how many are coming here where the test hasn't been met or where it's been eliminated before it ever got to this stage. I guess I phrase that poorly. I don't mean to pick on words, but the notion that this is a mountain that's a terrible burden, difficult to climb, just factually isn't true. Confessions are taken every day. Well, Your Honor, the case still suggests it is true and says that we're to indulge every reasonable possibility against or every reasonable presumption against waiver. And in this case, it seems to me the reasonable presumptions clearly cut against waiver. One other example, again, excerpts at pages 139 to 140, or correction, 140, the bottom of 140, beginning at line 23. The government had talked about, well, he graduated from high school, which they didn't mention was from special ed, and they said, well, he played football. And starting line 23, it says, did you play any sports? And the answer, no, just football. You look like you could be in parts of this country. Football is not a sport. It's a religion. Well, that's true, but I don't think he came from that part, i.e., Texas or Nebraska. Then it says, what position? And he says, anchor. What is that? Answer, like a receiver, but not. Again, I think that's just another simple illustration, Your Honor, of what Dr. Parrish said about his language skills, his ability to express himself, and that just because you played football doesn't mean you understand the nature of your Miranda rights and the consequences of giving them up. Thank you. Thank you. Thank both sides for useful arguments. The case of the United States v. Belvedere now submitted for decision in its comeback form, and we're in adjournment. Thank you very much, both of you. All rise.
judges: Fletcher W. , Clifton, Ikuta